## SUPREME COURT — SPECIAL TERM — HERKIMER COUNTY.

### December, 1922.

## THE PEOPLE v. RUTGER B. WARDER.

(120 Misc. 94.)

(1) PRACTICE—SUPREME COURT WILL NOT ENTERTAIN MOTION FOR AN ORDER RECOMMENDING A PARDON.

The power to grant reprieves, commutations and pardons being vested solely in the governor (Const., art. 4, § 5; Code Crim. Pro., § 692), no duty or responsibility rests upon the court to advise the governor as to what his action shall be in such matters or to intrude upon his high prerogative of duty.

13

(2) SAME.

    After defendant had been convicted of murder in the first degree for killing the husband of his accomplice who was jointly indicted with him she was tried and acquitted. During her trial defendant was brought from the death house at the state prison pursuant to a writ of habeas corpus *ad testificandum* and sworn as a witness for the prosecution. The evidence given by him on said trial was flatly contradicted by and at cross lines with his sworn statement given in great detail upon his arrest and used in the trial against him, wherein he implicated himself and his accomplice in the commission of the crime charged without reserve or uncertainty. *Held*, that a motion for an order granting or recommending pardon or commutation of the death sentence entered against him upon the theory that he was entitled thereto because of what he testified to on the trial of his accomplice will be denied for want of power.

MOTION for an order recommending pardon.

*W. Earl Ward, District Attorney (James H. Greene,* of counsel), for People.

*Charles B. Hane* and *William J. Gardinier,* for defendant.

DEVENDORF, J.:

    This is a motion by defendant for an order or direction of the court granting or recommending pardon or commutation of the sentence of death heretofore pronounced against him.

    Warder was convicted April 9, 1921, of the crime of murder in the first degree and pursuant to the statute the death sentence was entered against him. The prosecution was based on an indictment found in February preceding, alleging that he and his accomplice, Jennie Werner, on the 21st day of February, 1921, feloniously and with malice aforethought killed and murdered one Henry Werner.

    After the trial of Warder his accomplice was tried and acquitted by a jury. During her trial Warder was called by the prosecution and sworn as a witness. From the time of his conviction he had been an inmate of the death house at

Sing Sing prison and was brought to court at Herkimer on the 3d day of May, 1921, pursuant to a writ of habeas corpus *ad testificandum,* granted by the presiding justice of the Appellate Division of this, the fourth, department, at the request of the district attorney of Herkimer county. Before the issuance of the writ, the district attorney, his associate, Mr. Greene, and Mr. Gardinier, one of Warder's attorneys, interviewed him at Sing Sing prison. No promise, direct or implied, of immunity or favor was held out to him by either the district attorney or his counsel, and he subsequently so stated as appears in the Werner trial at folio 7006. He and his counsel were willing that he should be sworn as a witness at the trial and he took the position without hope or promise of reward or favor of any kind whatever.

This motion is made upon the theory that regardless of these facts, he is entitled to pardon or commutation for what he did. As a legal basis for that contention, his counsel rely upon the case of People v. Whipple, 9 Cow. 707, and subsequent dicta. This was a decision rendered in the Albany Oyer and Terminer in 1827, and of course many years prior to the statutes under which the criminal law of our state is operating.

On the day following the murder Warder made what appeared to be a complete confession, wherein he implicated himself and his accomplice, Jennie Werner, without reserve or uncertainty. In it he says: " She [referring to his accomplice] said if she had a man half as good as I was, she would be the happiest woman on earth, * * * and I said: 'I wish I had a woman like you,' she said to me, 'Get rid of this man,' and I asked her if she would go away with me and she said: 'where?' and I said: 'California,' * * * A week ago Saturday, I think, Mrs. Woodbridge and Mrs. Werner told me to take him (Henry) out and make believe we were hunting rabbits where we were cutting wood and that would be a good time for me to do it. * * * When we first began to talk about shooting Henry while hunting, she told me I could shoot

him with his own gun and leave the gun I shot him with by him loaded, and it would be thought someone else shot him, a game protecter or someone.  *  *  *  Last night Mr. and Mrs. Werner and I played cards, they seemed entirely friendly, it was just ten o'clock when we finished playing cards.  *  *  * She said: ' Henry, you've asked Skimmer (Warder) to go out and get rabbits several times and this is a good night; why don't you go out?' I also asked him to go out.  *  *  *  Mrs. Werner gave me some shotgun shells some time ago when we were planning this, one had buck-shot in and some fine shot, she and I also cut around several shells with a knife so the shot would not scatter when they were shot.  *  *  *  Werner went up the road and I went straight across from the house, in about twenty minutes I saw him, we met up by a hickory tree by the said-bank. I told him there was a rabbit down in the brush, there was no rabbit there. He knelt down and I was back of him, I put the gun up to shoot but I couldn't do it. I had the gun pointed to him, right close to his head, a half a dozen times and I couldn't do it.  *  *  *  After we had been out about an hour  *  *  *  we were walking towards the house and he was ahead of me and I pointed the shotgun, the double barreled one, at the back of his head and fired both barrels, he went down and I took the other gun which he had and shot that at him. I turned away when I shot and I don't know where it hit him." The above language with other perhaps equally condemning and relevant was contained in the document which was offered and received in evidence on his trial.   Evidently much weight was given it then by the jury.

At the Werner trial the following questions were asked him on cross-examination: " Q. Do you remember the occasion when you were brought to Herkimer in 1921? A. I do. Q. And taken over to the county jail? A. Yes. Q. And that night was placed under arrest, charged with the killing of Henry Werner, were you, and locked up? A. Yes, sir. Q. Did you kill him? : A. No, sir. Q. You didn't kill Henry

Werner, did you? A. No. Q. I call your attention to Exhibit 26 (said confession) for identification and to the signature, Rutger B. Warder, is that your signature? A. That is my signature. Q. You signed Exhibit 26, did you? A. I did." He was then asked if in that statement he said he pointed the shotgun, the double-barreled one at the back of his (Werner's) head and fired both barrels, to which he replied he possibly made the statement but that it was not true although it was sworn to before a notary public. He further stated therein that he had been charged by the sheriff and district attorney with the killing of Henry Werner and that when he had admitted he killed him, he knew it was not true. Subsequently he testified that Werner was killed in the cellar of the house and that Mrs. Werner came to his bedroom and told him she had killed Henry with the axe. Sufficient has been given from Warder's evidence on the Werner trial to show that it was flatly contradicted by and at cross lines with his said sworn statement given in great detail upon the evening of his arrest.

This court, as to granting commutation or pardon, has no discretionary power whatever. The power to grant reprieves, commutation and pardons is vested, solely, in the governor (N. Y. Const., art. 4, § 5) and a like provision is also found in section 692 of the Code of Criminal Procedure. This application does not come within the range of discretionary action on the part of the court. The governor represents that branch of our government which is appealed to for commutation. There is no duty or responsibility in that regard resting on this court. The law does not expect us to and in fact does not permit us to interfere with the power conferred upon the governor by the potential language of our Constitution. It is alone his privilege and responsibility to act in such matters. People ex rel. Forsyth v. Court of Sessions, 141 N. Y. 288.

Therefore, putting aside all questions of discretion, we must consider a rule of law claimed by defendant to be operative in cases of this kind. This, as I have said, rests largely upon what

was done in the Whipple Case in 1827. An entirely different legal situation prevailed there. Strang, Mrs. Whipple's paramour, had been convicted of murdering her husband. When her trial was about to proceed, the prosecution sought to call Strang as a witness for the People, his counsel objected and then it was agreed that question should be argued and considered as if he had consented to be sworn. This assumed state of facts was submitted and the court held, in substance, that he might come within the old common-law rule of approvement and be entitled to immunity if permitted to give testimony. The decision of the case with an assumption of facts not existing was entirely unnecessary. The court never reached a conclusion which the situation of that case in the first instance demanded. No court could or would compel a person accused of the crime of first degree murder, or convicted of that crime, to testify. Again the court says in the Whipple Case: " We are bound to presume that if admitted, he will speak the truth." I know of no such presumption in these days, in fact the contrary is plain to be seen in the case at bar. Again in the Whipple Case: " We are bound to presume further that the counsel for the prosecution believe that he will tell the truth," and says further: " We are to determine whether in the exercise of a judicial discretion to promise our recommend for pardon." There was no law that I am aware of and none now that called upon the court, as a legal duty, to liberate a felon already convicted of crime, who may have given evidence, after such conviction, in a case against his accomplice. Our statutes provide in many instances for the taking of the testimony of criminals and their accessories and I do not find a line therein saying, in substance, that a pardon or commutation awaits their release from the witness stand. On the contrary, the very statute which placed the power in the hands of the presiding justice of the Appellate Division to bring Warder to Herkimer to testify also provides that the prisoner " must, after having testified, be remanded to the prison from

which he was taken," and in that statute there is a special provision, " to bring up a prisoner sentenced to death." Had the legislature in mind the assumption of the Whipple Case as present day law, it would have provided for release, pardon or commutation, rather than mandatory language for a return of the prisoner to the prison from whence he came.

Warder, long before the Werner trial, had made a confession of guilt, under oath, which was obtained from him the very day of his arrest, without promise or threat and which was used in the trial against him. The Court of Appeals has since affirmed his conviction without opinion. At the Werner trial he was awaiting the result of an appeal in his case which had already been taken or was contemplated.

Even under the old rule of approvement, contained in ancient English cases, there are two major requirements before an accused, turning so-called state's evidence, could earn pardon or commutation: (a) He must confess his guilt; (b) his disclosure must be full, complete, ingenuous and true. As a witness Warder did not accuse himself on the Werner trial. Assuming that evidence true, it would not at common law be sufficient to convict him, either as principal or accessory before the fact. If his evidence established anything, it would be that of an accessory after the fact. He has not been tried, convicted or sentenced for that crime and never can be. When sworn, the days of his trial were over; he then gave a different version of the homicide than contained in his confession. In his evidence at the Werner trial he exonerated himself from active participation in the murder. His story then differed radically from his previous declaration. No harm came to him from the new story he told, no right of pardon or commutation was earned by it.

In disposing of the multitude of criminal cases which are passing through our criminal courts, there has grown up a practice of using an accomplice or accessory as a witness upon the trial of their associates. If used prior to indictment or

trial, it is proper that the greatest discretion in the direction of leniency should be extended, even though no promise were made, either direct or implied. I do not recall a case where such a person was used for the purpose of convicting an accomplice and was subsequently forced to trial. A very different condition exists here. Warder had made apparently a complete and full confession, covering pages of typewritten matter, giving in detail the crime in question. When he was called to the stand in the Werner Case, his trial was over; it was an issue of the past; there will never be a retrial of it; he neither harmed nor aided himself as a witness in the Werner trial; he was beyond that. He was a willing witness and he would not have been allowed or compelled by the trial court to testify had his counsel, who were present in the court at that time, objected.

As to the Whipple Case, it is in no way controlling or a precedent to be followed upon the decision of this motion. Our criminal law, largely, both in substance and in practice, is well covered by the provisions of the Penal Law and the Code of Criminal Procedure. Men, in recent years, after conviction, have been taken from the death house at Sing Sing to give evidence in criminal cases. As an illustration I cite the comparatively recent case of People v. Casalino, 229 N. Y. 599. The defendant with five others was charged with the crime of murder in the first degree in shooting and killing Mr. and Mrs. Holbach in Queens county, the murders being committed in carrying out a conspiracy to rob. It plainly appeared from the record that Casalino fired the shots which killed Mrs. Holbach. He was convicted of that crime and the Court of Appeals unanimously affirmed the conviction. Respites were granted to enable the People to call him, after his conviction, as a witness on the trial of the other participants and subsequently he was brought before the court on habeas corpus for that purpose. Executive clemency was asked on that ground only. The district attorney and a police officer promised him

to recommend favorable action on such application. Governor Miller says: "After considering all the circumstances of the crime and defendant's participation in it and his conduct and attitude from the time of his arrest down to the present time, I have reached the conclusion that insufficient grounds are presented to justify executive interference with the execution of judgment of the court."

Very frequently men are brought from prison cells, serving fixed terms, to give testimony against their associates, and so far as I am aware, there is no legal rule, such as is announced in the Whipple Case, commanding favor, clemency or immunity. I am prepared to say that there is none that is controlling upon the court where the facts and circumstances are as presented here.

That Warder is guilty of the crime charged has been decided by a jury after a fair trial, the conviction has been affirmed by the court of last resort in this state, and so far as the courts are concerned is a closed book.

I have, therefore, come to the conclusion that: First, the court has no power to commute or pardon; that is for the governor to act upon without influence one way or the other because of this decision. Secondly, it is not for this court to advise the governor as to what his actions shall be or to intrude upon his high prerogative of duty under the statutes and Constitution of our state.

Motion is, therefore, denied.

Ordered accordingly.